Hon. Joseph B. Goldman Acting Commissioner State of New York Division of Housing and Community Renewal
Your Deputy Counsel has asked how you are to treat a municipality's application of Community Development Block Grant funds toward satisfying its obligation to provide locally for a portion of the net cost of an urban renewal project. Your specific question is whether Community Development Block Grant funds applied by a municipality toward its Federally required contribution to a project are to be excluded from your computation of the "net cost" to the municipality under the State capital grant to the municipality which, by law, is restricted to not more than one-half of the "net cost * * * exclusive of any federal aid or assistance," to the municipality of an urban renewal project (General Municipal Law, §§ 510, subd 2, 557, subd 2). In short, are Community Development Block Grant funds Federal funds or local funds within the meaning of these sections for purposes of determining a municipality's net cost in completing an urban renewal project?
Prior to January 1, 1975, one of the ways in which the United States aided municipalities was through the Federal Slum Clearance and Urban Renewal Program (42 U.S.C. § 1450 et seq.). Under this program a municipality proposed an urban renewal project which, when approved by the United States, was entitled to a capital grant in an amount not exceeding a specified percentage of the net cost of the project (42 U.S.C. § 1453). In support of this program, New York authorized municipalities to participate in the Federal program (Article 15, General Municipal Law) and provided for the creation of Urban Renewal Agencies as separate public corporations to handle urban renewal projects (Article 15-A, General Municipal Law). In furtherance of the Federal program, the State provided for capital grants to municipalities to provide them with some of the funds required to meet the local share of the net cost of the approved Federal project limited, as stated above, to 50 percent of the municipality's or agency's net cost, exclusive of Federal aid or assistance (General Municipal Law, supra, §§ 510, 557).
In 1974, The United States abandoned the urban renewal project approach for a new Community Development program to begin on January 1, 1975 (Housing and Community Development Act, PL 93-383, 42 U.S.C. § 5301et seq.). Under this program, a municipality is entitled each year to a block grant in an amount determined by a formula (§ 5306), but the municipality has to apply for the grant, setting forth the uses to which it proposes to put its grant under specified restrictions on the use of block grants (§ 5304). Among the permitted uses of block grants is the "payment of the non-Federal share required in connection with a Federal grant-in-aid program undertaken as part of the Community Development Program" (§ 5305 [a] [9]). A Federal grant-in-aid program is "a program of Federal financial assistance other than loans and other than the assistance provided by this chapter [Community Development]" (§ 5302 [a] [10]). A grant under the old Urban Renewal Program is within this definition. That is, a pre-existing urban renewal project becomes part of a Community Development Program. See section 5316 (b), which authorizes further grants after January 1, 1975, for urban renewal commitments already in existence but provides that such further grants in a fiscal year must be deducted from that year's Community Development Block Grant entitlement.
The interrelationship of urban renewal projects in being on January 1, 1975, and the new block grant program is exemplified in the City of Little Falls, the case that generated your Division's opinion request. In 1979, the City received from the Department of Housing and Urban Development (HUD) a Certificate of Completion of Downtown, Project II, No. N.Y.R-191.* The Certificate showed a net project cost of $3,703,367 balanced by the Federal capital grant of $2,609,233 committed prior to 1975, a noncash local grant-in-aid of $826,265 (consisting of an allocation to the project of an appropriate part of the State Department of Transportation's [DOT] expenditures for an arterial highway), and cash local grants-in-aid of $267,869 (consisting of $126,400 in block grant funds and $141,469 in progress payments under the New York Contract discussed next). Following HUD's close-out, the State Division of Housing and Community Renewal (Division) prepared its close-out of its capital grant project No. NYSUR-110, its number for HUD's N.Y.R-191. The State's capital grant contract maximum was $166,434 but in any event no more than the City's contribution excluding Federal aid and assistance. The Division excluded DOT's noncash contribution of $826,265, presumably because it was a State contribution and not part of the City's contribution. (See the further discussion of this State contribution in the penultimate paragraph of this opinion.) This left $267,869, one-half of which would be $133,935 against which the Division's progress payments of $141,469 would leave the City owing the Division $7,534. The Division, however, subtracted the block grant funds of $126,400 from the local cash grants-in-aid, leaving a local contribution of only $141,469, the amount advanced by the Division. Thus, the Division claims reimbursement of one-half of the advance, $70,735, on the theory that the total local contribution came from the State through advances under an agreement that limited its obligation to one-half of the local contribution.
In your Division's request, you refer to the State Comptroller's Opinion No. 74-1120, which states that Federal grants such as block grant funds are "in the nature of trust moneys, separate and apart from municipal moneys. In a sense, the municipality is merely a conduit of the federal moneys, making expenditures on behalf of the federal government." That opinion dealt only with the question whether a Federal grant could be spent in a way that would offend the constitutional "gift and loan" prohibition if the funds used were municipal funds (Article VIII, § 1). Federal money in that context does not necessarily mean that the same money is Federal money in another context.
In the Community Development portion of the Housing and Community Development Act, Congress set forth its findings and intentions in enacting the legislation. One finding was that the establishment and maintenance of viable urban communities requires "systematic and sustained action by Federal, State, and local governments" (§ 5301 [b] [1]). Congress also stated that it intended that Community Development grants "not be utilized to reduce substantially the amount of local financial support for community development activities below the level of such support prior to the availability of such assistance" (§ 5301 [c]). Congress further pointed out that one of the purposes of the legislation was to consolidate a number of assistance programs into a consistent system of Federal aid that "provides assistance on an annual basis, with maximum certainty and minimum delay, upon which communities can rely in their planning" (§ 5301 [d]).
To say at this late date that the Legislature intended the restriction, "exclusive of federal aid or assistance", in the General Municipal Law (§§ 510, 557) to apply to a completely different Federal program instituted a decade later is to impute an intent to the Legislature to frustrate the new Federal program and to penalize municipalities and their agencies for relying upon HUD's approval of their use of block grant funds.* Federal policy of encouraging continued action to combat urban blight is frustrated if many municipalities are in the same position as Little Falls, for they will either fail to receive part of their State capital grant or will have to pay back to the State money that otherwise could be used in combatting urban blight. In addition, the net result of disallowing part of a State capital grant may result in a decrease in the amount of local support for Community Development activities because a municipality may have to offset the loss by cutting back on activities that further community development. Moreover, the Congressional purpose of providing assistance on an annual basis to facilitate orderly planning is frustrated if years later municipalities find that their planning has been in vain.
Reliance on HUD's policy of permitting use of block grant funds to meet a municipality's local grant-in-aid contribution ought not to be upset long after the event because the municipality, if it had known in advance that such use would penalize it, could have rearranged its use of block grant funds in a manner that would have permitted it to use its own money to meet its urban renewal commitment. For example, a municipality can use block grant funds for a variety of public works projects (§ 5305 [a] [2]). If a municipality had known some years ago that its use of block grant funds to meet its urban renewal commitment would jeopardize its State capital grant, the municipality could have transferred some proposed public work from its municipal budget to its block grant budget and freed municipal funds for its urban renewal commitment. In short, when a municipality has several sources of funds that can be applied to a variety of projects, it can structure its expenditures to meet necessary legal restrictions. But the municipality must know the rules in advance. It ought not to be penalized after the fact by a legal restriction that it could not anticipate. We do not believe that the Legislature over a decade ago intended the words "exclusive of federal aid and assistance" to have the consequence of retroactively upsetting the Community Development Block Grant program.
The danger of imputing legislative intent retroactively to cover a different Federal-State interrelationship is also exemplified if "exclusive of federal aid and assistance" is construed literally in accounting for the DOT contribution of $826,265 in the Little Falls case described earlier. This State contribution is exclusive of Federal aid or assistance. Therefore, it could be argued, the net cost for purposes of section 557 was $1,094,134. If the block grant funds are excluded, the net cost exclusive of Federal aid was $967,734. Half of that is $483,867. This would mean that the State capital grant contract maximum of $166,434 is due the Agency. Thus, instead of $7,534 being owed to the Division as explained earlier, the Division would owe the Agency $24,965. We think that it is no more appropriate to construe section 557 in this literal fashion than it is to ignore the current Federal permission to convert block grant funds into a local contribution to an urban renewal project.
We conclude that block grant funds used to meet the local grants-in-aid requirement under a Federal urban renewal project are not Federal aid or assistance to be excluded in computing a local government's contribution to the project when determining the amount payable to the local government under a State capital grant for the project.
* This project was administered by the Little Falls Urban Renewal Agency. "City" and "Agency" are used interchangeably in this opinion.
* That the Legislature is well aware of the significance of the relationship between the former urban renewal program and the current community development program is demonstrated by the special acts enacted since 1974 changing the names of urban renewal agencies to community development agencies. See, for example, General Municipal Law, §§ 575-a, 589, 606, 620, 627, 654 (Huntington) and 654 (North Hempstead); see also, chs 382 and 484, L 1980. The significance of these name changes is discussed in Op Atty Gen (Inf.) May 14, 1980.